**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Shook,<br><br>    Plaintiff,<br><br>v.<br><br>Williamson Valley Fire District, et al.,<br><br>    Defendants. | No. CV-23-02339-PHX-SHD<br><br>**ORDER** |

Pending before the Court is the motion for summary judgment filed by Defendants Williamson Valley Fire District (the "District"), Fire Chief Bryan Smith ("Chief Smith"), and Captain Mike Love ("Captain Love") (collectively, "Defendants") seeking dismissal of Plaintiff Jason Shook's claims for discrimination under the Rehabilitation Act, Family and Medical Leave Act ("FMLA"), and 42 U.S.C. § 1983. (Doc. 36.) For the following reasons, Defendants' motion will be **granted in part**: Shook's claims under the FMLA and § 1983 will be dismissed, his Rehabilitation Act claim against Chief Smith and Captain Love will be dismissed, and his Rehabilitation Act claim against the District may proceed.[1]

**I.    FACTUAL BACKGROUND**

The following facts are derived from the parties' statements of facts and evidence submitted with their briefing. Shook began working for the District as a reserve firefighter medic in 2017 at Station 95. (Doc. 37-3 at 7; Doc. 50-1 at 37–38.) Chief Smith is the

---

[1]    Defendants' request for oral argument, (Doc. 36), is denied because the issues are fully briefed, and oral argument would not aid the Court's decision process. *See* LRCiv 7.2(f).

current Fire Chief for the District. (Doc. 37-2 ¶ 3.) Captain Love was Shook's Captain and direct supervisor beginning in 2019. (Doc. 37-3 at 8; Doc. 37 at 2; Doc. 50 at 2.)

### A. Shook's Employment

The District includes two stations. (Doc. 50 at 13; Doc. 50-1 at 37.) The District's Station 95 encompasses several areas in Arizona: Bagdad, Hillside, Solar Acres, Yava, Wikiup, the Bagdad Copper Mine, and part of Highway 93. (Doc. 50-1 at 37; *see also* Doc. 50 at 2.) The District's Station 91 encompasses other areas in Arizona: Hootenanny Holler, Long Meadow Ranch, Crossroads Ranch 1 & 2, and Las Vegas. (Doc. 50-1 at 37.) Of the two stations, Station 91 is "generally understood to have lower call volume and less intense calls." (*Id.* at 38.)

Before Shook began working for the District, he completed a Public Safety Personnel Retirement System (PSPRS) Pre-Existing Condition(s) Report. (Doc. 37-1; Doc. 37-2 ¶ 4.) In this report, Shook disclosed that he had a "few pre-existing fractures but no mental conditions." (Doc. 37 at 1; Doc. 37-1; Doc. 50 at 1–2.)

In December 2019, Shook received a written reprimand from Captain Love "pertaining to operational readiness and [the District's] Standards of Conduct." (Doc. 37-6 at 1–2; *see also* Doc. 50 at 2–3 (not disputing authenticity or existence of document); Doc. 50-1 at 11.) Captain Love stated that, although Shook "received multiple informal coaching opportunities and sit-down meetings, he continue[d] to make poor decisions regarding equipment/tools on emergency apparatus," which "could have directly affected the emergency services provided by" the District. (Doc. 37-6 at 1.) He also stated that it was his "expectation moving forward that NO alterations on apparatus/equipment take place without approval from [him] first" and that "further issues/concerns pertaining to these matters [could] result in further disciplinary action." (*Id.*) Shook disputes whether the written reprimand accurately described the events discussed therein and asserts that Captain Love issued the reprimand because he was "pissed off [that Shook] approached him with something that he had to deal with and he was maxed out at the time." (Doc. 50 at 3; Doc. 50-1 at 15–16.) Shook does not dispute that Captain Love reprimanded him.

(*See* Doc. 50 at 2–3; Doc. 50-1 at 10–11.)

In May 2020, Shook received a verbal warning by another Captain because it was the second time he was late in 90 days. (Doc. 37-7 at 1; Doc. 50-1 at 17.) Shook does not dispute that he received this warning or that he was tardy for the second time. (Doc. 50 at 3; Doc. 50-1 at 17–19.)

In March 2021, Shook received a verbal warning for being "absent from his assigned shifts on March 7, 2021 and March 30, 2021." (Doc. 37-7 at 2.) The record for the verbal warning cited the District's policy on attendance and punctuality and the Standard of Conduct. (*Id.*) Shook does not dispute that he received this warning or that he was absent from the listed assigned shifts. (Doc. 50 at 3; Doc. 50-1 at 17.)

In April 2021, Shook received another written reprimand from another captain "pertaining to operational readiness and [the District's] Standards of Conduct." (Doc. 37-8 at 1–2.) The document stated that "[e]ach shift [had] received multiple informal coaching opportunities with specific items of concern passed down during documented passdown reports," but that it was discovered that water tanks were "down significantly" and "significantly low" on two occasions. (*Id.* at 1.) "Everybody that was an engineer" received a written reprimand, not just Shook. (Doc. 50-1 at 20–21; *see also* Doc. 50 at 3–4.)

Chief Smith stated that in June 2021, Shook was placed into the Captain position temporarily when the assigned Captain was unavailable. (Doc. 37-2 ¶ 11.) According to Chief Smith, "Shook displayed a lack of knowledge about how to operate certain equipment (which resulted in damage to that equipment) and was unable to properly manage the other firefighters." (*Id.*)

"When Shook was moved back to his normal position after the shift ended," Chief Smith stated that Shook "became belligerent, started yelling and screaming at other employees, and dangerously swung an axe against a door and desk, causing damage to both." (*Id.* ¶ 12.) Shook received two written reprimands arising out of this incident, (Docs. 37-9, 37-12), and Shook does not dispute that he "yelled, swung an axe at a desk,

and damaged it when he was upset," (Doc. 50 at 4). (*See also* Doc. 37-10 (email from Shook stating that he was "headed back . . . with an axe and caught [his] hip on the corner of the desk" and "let it fly and gave it a whack").) According to the reprimands, this incident violated the District's policy on workplace violence and the Standards of Conduct. (Doc. 37-9 at 1; Doc. 37-12 at 1.)

### B. Shook's Leave of Absence

Following this incident, the District placed Shook on administrative leave and required him to complete six professional counseling sessions through the District's Employment Assistance Program ("EAP"). (*See id.*; Doc. 37-2 ¶ 13; Doc. 50 at 4.) Shook "requested to instead choose his own counselor, which the District approved." (Doc. 37-2 ¶ 14; Doc. 50 at 4–5.)

In August 2021, Chief Smith informed Shook via email that Shook's "benefits of the Craig Tiger Act that [he was] receiving [would] be ending"[2] and, after September 4, 2021, the District would "end the payroll benefit provided under the Craig Tiger Act" but would continue to pay for counseling sessions. (Doc. 37-13 at 1; Doc. 37-2 ¶ 15; Doc. 50 at 5.) In this email, Chief Smith advised Shook that there were "no light duty options available," so if Shook or his counselor felt that he was "unable to fulfill [his] employment obligations," he could: (1) return to work under his regular work schedule; (2) request unpaid FMLA coverage, which would give him an additional four weeks of coverage because FMLA coverage ran concurrently with Craig Tiger Act benefits; or (3) request an "early medical retirement." (Doc. 37-13 at 1; Doc. 37-2 ¶¶ 16–18; Doc. 50 at 5.) Chief Smith informed Shook that he needed to advise the District of his intentions by September 3, 2021, and that a failure to "advise the district of [his] intentions by [that] date or failure to report to work . . . [would] result in disciplinary action." (Doc. 37-13 at 1; Doc. 37-2 ¶¶ 19–20; Doc. 50 at 5.)

Shook states that he never applied for FMLA certification for his leave and Chief

---

[2] The Craig Tiger Act provides for certain benefits to "peace officers, firefighters and 911 dispatchers who are exposed to" certain traumatic events. *See* Ariz. Rev. Stat. § 38-673.

Smith's August 2021 letter was the first time he learned that he had been placed on FMLA leave. (Doc. 50 at 14; Doc. 50-1 at 24–25.) He further states that he would have "elected not to have his FMLA run concurrently with his Craig Tiger Act leave." (Doc. 50 at 14–15; Doc. 50-1 at 26.)

On September 3, 2021, Shook responded that, "under advisement of [his] counselor [he would] do the FMLA option." (Doc. 37-14 at 1; Doc. 37-2 ¶ 21; Doc. 50 at 5.)

The same day, Chief Smith sent Shook a letter stating that his FMLA and Craig Tiger Act "job protected leave" would expire on October 1, 2021 and requested that Shook inform Chief Smith regarding his "ability to return to work on or before 10/1/21" within "five business days of receiving [the] letter." (Doc. 37-15; Doc. 37-2 ¶ 22; Doc. 50 at 6.) Chief Smith also informed Shook that if he was unable to return to work by then, he could "request a leave extension as an accommodation under the Americans with Disabilities Act (ADA)." (Doc. 37-15; Doc. 37-2 ¶ 23; Doc. 50 at 6.) To do so, however, Shook would have to "provide additional medical information to support the continuing need for leave." (Doc. 37-15; Doc. 37-2 ¶ 24; Doc. 50 at 6.)

On September 10, 2021, Shook's counselor, Natalie Summitt, emailed Chief Smith, informing him that she "continue[d] to recommend that [Shook] not work any firehouse shifts at [the District] due to the nature and depth of [Shook's] complex Post Traumatic Stress Disorder (PTSD) symptomology." (Doc. 37-16 at 1; Doc. 37-2 ¶ 25; Doc. 50 at 6.) Summit also stated that under her understanding of the Craig Tiger Act, Shook was "eligible for another 30 days where he [did] not respond to the station for shift work based on his level of work readiness," which would "afford him the opportunity to address . . . his PTSD symptoms." (Doc. 37-16 at 2.)

Defendants state that the District "first learned of Shook's PTSD after he began treating with his counselor," and that "[a]t no time beforehand did Shook inform [Chief Smith] that he suffered from PTSD." (Doc. 37-2 ¶¶ 55–56.) Shook states, on the other hand, that he disclosed his PTSD in his application for employment and mentioned it in his email addressing the June 2021 incident. (Doc. 50 at 11; Doc. 50-1 at 7–8; Doc. 37-10.)

On October 1, 2021, Shook emailed Chief Smith to ask whether Chief Smith wanted Shook "in to work tomorrow," as he was "confused because [his] counselor [said he has] more Tigers act time" and he could not "really tell." (Doc. 37-17; Doc. 37-2 ¶ 26; Doc. 50 at 6.) He explained that he was "kinda stuck" because his "counselor [said he was] not good for work yet and based on recent events, that seem[ed] right." (Doc. 37-17 at 2.) He also disclosed that he "started [but had not] completed [his] ACLS/PALS stuff" but "probably could tonight." (*Id.*; Doc. 37-2 ¶ 26; Doc. 50 at 6.)

The same day, Summit emailed Chief Smith, stating that she "**strongly** advise[d] against [Shook's] return to work date" of October 2, 2021, because she had "documented in multiple ways, including to [Chief Smith] every week, that he [was] not fit to return to duty." (Doc. 37-18; Doc. 37-2 ¶ 27; Doc. 50 at 6.) She also asked Chief Smith to "reconsider this decision" and advised that Shook "continue[d] to need therapy sessions." (Doc. 37-18.)

On October 3, 2021, Chief Smith responded to Shook's October 1 email, stating that Shook had "exhausted all [his] leave time" under both the Craig Tiger Act and the FMLA but that the District would "continue to pay for [his] mandated therapy sessions." (Doc. 37-19 at 1; Doc. 37-2 ¶ 28; Doc. 50 at 7.) Chief Smith also stated that Shook was "required to return to work" and if he requested "additional leave time, [he could] do so under the [ADA]," but he would be required to request the accommodation and provide the District with "supporting documentation . . . as to the nature of the disability." (Doc. 37-19 at 1; Doc. 37-2 ¶ 29; Doc. 50 at 7.) Such documentation would need to be submitted by October 6, 2021. (Doc. 37-19 at 1; Doc. 37-2 ¶ 31; Doc. 50 at 7.)

On October 5, 2021, Chief Smith emailed Shook stating that Shook's "request for additional ADA leave time [was] granted on a conditional basis" and that Shook was required to "supply to the District a letter from [his] Dr. stating the diagnosis and reason that [he could not] work in [his] primary job capacity, any additional accommodations that [he] might require, and [his] expected date of return to duty." (Doc. 37-20 at 1; Doc. 37-2 ¶¶ 32–33; Doc. 50 at 7.) Chief Smith also stated that the District would "only be able to

grant [Shook] an additional four weeks of ADA leave," so his "expected return to work date" would be November 6, 2021. (Doc. 37-20 at 1; Doc. 37-2 ¶ 34; Doc. 50 at 7.) Finally, Chief Smith informed Shook that if he was "unable to return by [that] date, [his] position [would] be placed in an unprotected status." (Doc. 37-20 at 1; Doc. 37-2 ¶ 35; Doc. 50 at 8.)

On October 6, 2021, Summit informed Chief Smith via email that Shook could not "return to work at [that] time without compromising his mental health condition and furthering his traumatic incidents." (Doc. 37-21 at 1; Doc. 37-2 ¶ 36; Doc. 50 at 8.) She also stated that when Shook was "able to return to work [she might] recommend light duty during an adjustment period, but that [was] down the road." (Doc. 37-21 at 1.)

On November 1, 2021, Chief Smith informed Shook via email that the "additional leave time that was granted to [him was] coming to an end" and that his "expected return to work" date was November 6, 2021. (Doc. 37-22; Doc. 37-2 ¶ 37; Doc. 50 at 8.) Chief Smith further stated that before Shook could return to work he had to "present the District a fit for duty/return to work paperwork from [his] physician and [his] counselor" and "all of [his] current certification cards." (*Id.*) The email also informed Shook that if he did not provide his "intentions regarding return to work and schedul[e] a meeting" with Chief Smith before November 3, 2021, he would be "remove[d] . . . from the schedule . . . and this time [would] be paid as PTO if [he had] any remaining." (Doc. 37-22; Doc. 37-2 ¶ 38; Doc. 50 at 8.)

Shook states that this letter was the "first time [he] was informed about a deadline of November 3, 2021" but acknowledges that "[o]n numerous occasions [his] supervisor . . . had reiterated the directive to have [his] certifications in order when [he] came back to work." (Doc. 50-1 at 39.)

On November 2, 2021, Shook responded that his "intention [was] to return to work for shift on Nov. 6th and 7th" and that he was "going to get in touch with [Chief Smith] and request a time to meet that works," but he was "still working on some of the required documentation" that would be "forthcoming." (Doc. 37-23; Doc. 37-2 ¶ 39; Doc. 50 at 8.)

On November 3, 2021, Shook emailed Chief Smith stating that he would "not have everything together by end of day," as he "wasn't anticipating a deadline in advance of the 6th being put in place." (Doc. 50-1 at 42.) He disclosed that he had "both health care providers [sic] input and [could] get [Chief Smith] everything [that was] asked for" by November 4, 2021, and this was the "best [he] could do with the condensed time frame." (*Id.*; *id.* at 39.) According to Shook, his recertification was "easily achievable by November 4, 2021" because he had approximately three hours remaining on the certification. (*Id.* at 39–40.)

Chief Smith responded the same day that if Shook did not provide "the information by [5:00 p.m. that day], [Shook's] next 2 shifts [would be] filled." (*See* Doc. 50-1 at 39, 44.)

### C. The Return-to-Work Letter and Return-to-Work Date

On November 4, 2021, Summit emailed Chief Smith a return-to-work letter stating that she requested ADA accommodations on Shook's behalf. (Doc. 37-24; *see* Doc. 37-2 ¶ 40; Doc. 50 at 9.) Specifically, she "remain[ed] convinced that it [was] not best for either [Shook] or [the District] to return [him] to the same situation/firehouse he last worked" and expressed her hope that Shook could "continue his remaining years of service as a Fire Fighter (~light-duty, minimal impact/slower paced firehouse) and [the District could] respectfully move forward." (Doc. 37-24 at 2.) Shook stated that Summit had "made the same, or similar request on three other occasions prior to [his] return date" to transfer him to Station 91 because it would be "less triggering for [his] PTSD." (Doc. 50-1 at 38.)

The same day, Chief Smith responded to Summit, stating he "read [her] return-to-work letter and it seem[ed] that [Shook was] not fit to return." (Doc. 37-25 at 1; Doc. 37-2 ¶ 41; Doc. 50 at 9.) Chief Smith noted that Shook "exhibited instances of workplace violence prior to seeking treatment and [Summit] state[d] in [her] letter that he [had] PTSD issues that [they were] still working on," but Shook would be "returning to regular duty as a paramedic on an ambulance where he could be the sole provider of patient care for up to an hour or more for each call." (*Id.*) Chief Smith thus asked whether Shook could "return

- 8 -

to that job, or [would] he revert to violent outbursts, self-sabotage, or worse," and asked Summit to "[p]lease advise as [the] letter sent a mixed signal." (*Id.*)

Chief Smith never received a response from Summit. (Doc. 37-2 ¶ 42; Doc. 50 at 9.)

On November 6 and November 7, 2021, Shook did not appear for work. (Doc. 37-2 ¶ 43; Doc. 50 at 9.) In his declaration, Shook stated that, although he was "willing to work [his] scheduled shifts," after seeing that he had been taken off the schedule, he "remained off duty for November 6 and 7" and, because those days "fell on a weekend," he "anticipated getting in touch with [Chief Smith] on Monday, November 8, 2021, to see when [Chief Smith] wanted [him] to get . . . the documents." (Doc. 50-1 at 39–40.) Because his next shift was scheduled for November 12, 2021, Shook believed he "had four days to coordinate with [Chief Smith]." (*Id.* at 40.)

### D. Shook's Resignation

On November 8, 2021, Chief Smith sent Shook a letter stating, among other things: (1) Shook was scheduled to return to work on November 6, 2021; (2) he had been informed that "the District would be unable to grant any additional time off" after his ADA leave; and (3) he had been instructed to provide documentation that was necessary to return to work, which he had not provided. (Doc. 37-26; Doc. 37-2 ¶¶ 44–45; Doc. 50 at 9–10.) The letter also stated that, because of Shook's "lack of communication and inability to provide documentation of [his] return-to-work and current certification status, the District accept[ed his] voluntary resignation." (Doc. 37-26 at 2; Doc. 37-2 ¶ 45; Doc. 50 at 10.)

On November 9, 2021, Shook responded, stating that he wanted to "express [his] decision to resign for medical reasons," which was "[b]ased primarily on the fact that [his] counselor wouldn't sign off on a fit for duty[] and [he] was unable to engage in the way [he] wanted." (Doc. 37-27; Doc. 37-2 ¶ 46; Doc. 50 at 10.) The parties dispute whether Chief Smith contacted Shook after receiving this email to inform him that he could apply for medical retirement, with Defendants claiming that Chief Smith did so. (Doc. 37-2 ¶ 47; Doc. 50 at 10; Doc. 50-1 at 27–28.)

  **E.** **Shook's Medical Retirement**

The District "paid for Shook to obtain the necessary medical evaluations and assisted him in submitting his application" to medically retire. (Doc. 37-2 ¶ 49; Doc. 50 at 10.) Shook's application was approved. (Doc. 37-2 ¶ 50; Doc. 50 at 10.)

## II. PROCEDURAL HISTORY

On November 8, 2023, Shook filed this suit against the District, asserting claims under the Rehabilitation Act, the FMLA, and the Craig Tiger Act. (Doc. 1.)

On January 24, 2024, Shook amended his complaint to add Chief Smith and Captain Love, removing his claim under the Craig Tiger Act and adding the § 1983 claim. (Docs. 10, 13.)

On January 15, 2025, Defendants moved for summary judgment. (Docs. 36–37.) On March 27, 2025, Shook responded, (Docs. 49–50), and on April 25, 2025, Defendants replied, (Doc. 53).

## III. LEGAL STANDARD

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not all factual disputes are material or genuine, however: a "fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

At summary judgment, there are shifting burdens of production. A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the "moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). At bottom, the Court's "inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

**IV. DISCUSSION**

Defendants move for summary judgment on all three claims. Shook states in his response that he "does not dispute dismissal of his Section 1983 and FMLA claims." (Doc. 49 at 2 n.1.) Summary judgment will thus be granted in Defendants' favor on those claims. *See Ismail v. Amazon.com*, 2018 WL 2684391, at *10 (W.D. Wash. 2018) (granting summary judgment on claims without analysis where the plaintiff conceded that her claims should be dismissed and collecting cases). As for Shook's Rehabilitation Act claim, Defendants argue that Shook is not entitled to relief because he was "not qualified to perform the essential functions of his job"—namely, the essential requirements to show up to work and be cleared to return to work. (Doc. 36 at 1, 8–10; Doc. 53 at 6.) Defendants also argue that, at a minimum, Chief Smith and Captain Love should be dismissed because

personal liability is not available against individual employees. (Doc. 53 at 7.)

### A. The Rehabilitation Act

The Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The term "program or activity" includes the "operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government" if "any part of [it] is extended Federal financial assistance." *Id.* § 794(b)(1)(A).

This section of the Rehabilitation Act is "interpreted coextensively" with the ADA "because there is no significant difference in the analysis of rights and obligations created by each provision." *Mayfield v. City of Mesa*, 131 F.4th 1100, 1109 (9th Cir. 2025) (quotation marks omitted); *see also Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009) (referring to standards of Title I of the ADA when a Rehabilitation Act claim concerns alleged employment discrimination). The connection between both acts is "nuanced," however. *Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 868 (9th Cir. 2022); *see also Fleming*, 587 F.3d at 939, 941–42 (noting that the Rehabilitation Act is broader in scope than the ADA and holding that Title I's standards are incorporated into the Rehabilitation Act, not "Title I *in toto*").

"To prevail on a [Rehabilitation Act] claim, a plaintiff must establish that" (1) "he is an individual with a disability," (2) "he is otherwise qualified to receive a certain benefit," (3) "he was denied the benefits of a certain program solely by reason of his disability," and (4) "the program receives federal financial assistance." *Bax*, 52 F.4th at 866 (citation modified). Individuals who seek compensatory damages must also prove a "*mens rea* of intentional discrimination which may be met by showing deliberate indifference." *Id.* (citation modified).

### B. Claim Against Chief Smith and Captain Love

Defendants argue that Chief Smith and Captain Love should be dismissed because

Rehabilitation Act claims are not available against individual employees. (Doc. 53 at 7.) Neither the ADA nor the Rehabilitation Act "imposes individual liability on public officials." *W.V. v. Whitier Union High Sch. Dist.*, 2016 WL 11520809, at *3 (C.D. Cal. 2016). Because this is the only claim remaining against Chief Smith and Captain Love, summary judgment is granted in their favor, and they will be dismissed as defendants.

### C. Claim Against the District

The sole remaining issue is thus whether the District is entitled to summary judgment on Shook's Rehabilitation Act claim. The District bases its argument solely on the second element of the Rehabilitation claim—whether Shook was a qualified person—so the other elements need not be addressed.

An "otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979). A "qualified individual is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the position." *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1175 (9th Cir. 1998) (per curiam) (citation modified). "Essential functions are the fundamental duties of the relevant position." *Id.* "When a handicapped person is not able to perform the essential functions of the job, the court must also consider whether any reasonable accommodation by the employer would enable the handicapped person to perform those functions." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987) (quotation marks omitted).

#### 1. Failure to Attend Work

The District first argues that Shook was not qualified to perform the essential functions of his job because he was unable to "show up and attend work." (Doc. 36 at 8–9.) It points to Shook's and Summit's statements "on multiple occasions that he could not return to work" and to the fact that "neither Shook nor [Summit] ever provided a date by which Shook could return." (*Id.* at 9.) Finally, it argues that "Shook has not come forward with any evidence that a reasonable accommodation existed at the District to enable him to appear at work and to perform his essential functions" and that Shook essentially wants

an accommodation to "not attend work." (*Id.* at 10 (emphasis omitted).)

Shook disputes that the accommodation he sought was to not work—"[a]lthough [he] likely would have appreciated and accepted more leave as an accommodation so that he would have had more time to recover before returning to work," Shook argues "the evidence in the record demonstrates that [he] actually sought two alternative accommodations that would not have required *any* additional leave." (Doc. 49 at 8–9.) These two accommodations were "a light duty position" or "a transfer to another firehouse that was slower paced than Station 95." (*Id.* at 9.) He argues that such alternative accommodations "were reasonable, would not have presented an undue hardship, and would have allowed [him] to perform the essential functions of the position he desired and/or previously held." (*Id.*) Alternatively, Shook argues that his ADA leave should not have expired until November 21, 2021, so his absences on November 6 and 7 should have been considered protected leave. (*Id.* at 9–11.)

Construing the evidence in a light most favorable to Shook, the District is not entitled to summary judgment on its argument that Shook was not qualified due to his failure to attend work. A reasonable factfinder could find that Shook was ready to return to work on November 6 and 7, and his absence was deemed a voluntary resignation before he had the opportunity to demonstrate otherwise. Shook stated in his declaration that he was "ready and willing to work [his] scheduled shifts on November 6 and 7, 2021," (Doc. 50-1 at 40), and there is evidence in the record that supports this testimony. He informed Chief Smith on November 2, 2021 that his "intention [was] to return to work for shift on Nov. 6th and 7th." (Doc. 37-23.) And according to the email he sent Chief Smith the following day, he "definitely [did not] want to miss anymore work" and, rather than stating he would not be at his shift on November 6, he said he could get the documentation to Chief Smith by November 4, in advance of that shift. (*See* Doc. 50-1 at 42.)

Additionally, Shook stated in his declaration that he saw that he had been removed from the schedule on November 6 and 7, and he was thus not required to report for duty. (*Id.* at 39.) A reasonable factfinder could find Shook's belief reasonable. First, Chief

Smith stated that if Shook did not provide the necessary documentation by November 3, 2021, he would be "remove[d] . . . from the schedule for November 6[] and 7[] . . . and this time [would] be paid as PTO if [he had] any remaining." (Doc. 37-22.) Chief Smith did not say that even if Shook failed to provide the documentation he was still expected to appear for his shift or else he would be deemed to have voluntarily resigned. (*See id.*) Further, Chief Smith's statement that removal from the schedule would result in Shook's time being "paid as PTO" could be read to imply that Shook was off duty, as he believed. (Doc. 50-1 at 39 ("I remained off duty for November 6 and 7.").)

Even if Shook did not have any PTO remaining, the evidence suggests that Shook would not have been deemed to resign merely for lack of PTO: the District's policy provides that if an employee "does not pass a fitness-for-duty examination, the employee shall be immediately removed from duty, and shall be subject to use sick leave or vacation leave," but if the "employee has depleted all paid leave accrual, the time off shall be without pay." (Doc. 37-5 at 7.) According to this policy, an employee who fails a fitness-for-duty examination is removed from duty and placed on either paid or unpaid leave. They are not, however, expected to nevertheless come to work, nor are they terminated. (*See id.*) Additionally, the District's FMLA policy states that, if an employee's leave was "due to the employee's own serious health condition" and the employee failed to provide a physician's release, this could "result in a *delay* in the employee's return to work," which indicates that an employee is not required to come to work despite failing the fitness test. (*Id.* at 18 (emphasis added).) A reasonable factfinder thus could find that Shook was willing to come to work on November 6 and acted reasonably in not coming to work after confronted with Chief Smith's statements that (1) his shifts would be filled and (2) his time off would be PTO if he did not submit his documentation by November 3.

Summit's November 4, 2021 correspondence with Chief Smith does not change this conclusion. In her previous correspondence, Summit stated plainly her belief that Shook could not return to work at all for a limited period of time. On September 4, 2021, she stated that she did "not recommend that [Shook] work a firehouse shift this next week."

- 15 -

(Doc. 37-16 at 2.) On September 10, 2021, she stated that she "continue[d] to recommend that [Shook] not work *any* firehouse shifts at [the District]" and that she did "not support his return to work status *at this time*." (*Id.* at 1 (emphases added).) On October 1, 2021, she stated that she "**strongly** advise[d] against [the October 2, 2021] return to work date" and that Shook was "not fit to return to duty." (Doc. 37-18.) On October 6, 2021, she stated that Shook could "not return to work at this time" and when Shook *was* able to return to work, she "may recommend light duty during an adjustment period." (Doc. 37-21 at 1.)

Summit's November 4, 2021 letter included different wording. In it, Summit stated that she "underst[ood] that [Shook was] to return to work on Nov 6" and that Shook "appear[ed] committed to returning his work." (Doc. 37-24 at 2.) In connection with Shook's "completing his tenure," she "hope[d] that [Shook could] continue his remaining years of service as a Fire Fighter (~light-duty, minimal impact/slower paced firehouse)." (*Id.*) She did not say that he could not return to work, only that it was "not best for either [Shook] or [the District] to return [Shook] to the *same situation/firehouse he last worked*." (*Id.* (emphasis added).) She "hope[d] [Chief Smith and Shook could] agree on a workable plan." (*Id.*) According to Shook, he and Summit discussed that "working at Station 91 would likely be less triggering for [his] PTSD than working at Station 95 . . . due to the difference in call volume and the intensity of calls," (Doc. 50-1 at 38), so Summit's statement that Shook should not return to the "same situation/firehouse" could be read as indicating that Shook could return to work if the accommodation of a transfer to Station 91 were adopted, (Doc. 37-24 at 2). Although the November 4 letter is not a model of clarity, a reasonable factfinder could find that Summit approved Shook's return to work and, rather than stating he could not return at all, sought to obtain accommodations of light duty or a "slower paced firehouse" so Shook could "complet[e] his tenure. (*Id.*) Indeed, Chief Smith told Summit that her letter sent a "mixed signal," confirming it offers more than one interpretation. (*See* Doc. 37-25 at 1.) The letter thus does not conclusively establish that

Shook was unable to return to work.[3]

Additionally, although the District argues that Summit's requested accommodations were not available, (Doc. 53 at 2–4), the evidence does not establish this. The evidence is mixed on whether light duty positions were available. (*Compare* Doc. 37-13 at 1 (stating no light duty was available), *with* Doc. 37-14 at 1 (Shook stating that he spoke with some employees who mentioned a "training spot" with a "definite need" and suggesting a "similar FIT type spot").) The District has not offered any evidence that it could not have transferred Shook to Station 91 to accommodate him, and the only evidence it cites in the reply is Summit's letter, which it argues establishes that Shook could not return to work at all. (*See* Doc. 53 at 3–4.) As discussed above, however, the letter does not conclusively establish that Shook was unable to return to work "any shifts at any station," contrary to the District's argument. (*Id.* at 4.)

In sum, the District has not met its burden of showing that the undisputed facts establish that Shook's two shift absences rendered him unqualified for his position for purposes of his Rehabilitation Act claim.

### 2. Failure to Submit Releases and Complete Certifications

In his response, Shook argues that even if he "lacked the required certifications to perform work as a firefighter engineer and paramedic—which would be a new argument that was not raised in [the District's] initial Motion—the evidence suggests that [Shook] would have easily gotten his certifications up to date before returning to work." (Doc. 49 at 11.) He cites to his declaration, in which he stated that, as of November 3, 2021, "it would have only taken him three more hours to complete his certifications." (*Id.* at 11.) He argues that he would have completed the certifications on November 4 but for Chief

---

[3] Shook stated in his resignation email to Chief Smith that Summit would not "sign off on a fit for duty," (Doc. 37-27), but it is unclear whether Shook meant that she would not sign off at all or if she would not sign off absent one of the accommodations she requested on his behalf, (*see* Doc. 37-24 at 2). Construing the evidence in a light most favorable to Shook, the Court accepts the latter interpretation. Even if Shook's statement were interpreted to mean that Summit would not release him for duty at all, however, this would still not entitle the District to summary judgment because, for the reasons explained in the next section, its policies do not treat the failure to obtain a release as a circumstance that requires immediate removal from a position. *See* Section IV.C.2, *infra*.

- 17 -

Smith's "unequivocal[] [statement] that [Shook's] November 6 and 7, 2021 shifts would be filled," which made him believe "he would have a few extra days to get his certifications completed before his next scheduled shift on November 12, 2021." (*Id.* at 12; *see also* Doc. 50-1 at 39–40.)

The District argues that Shook "did not submit the required fit-for-duty documentation or any confirmation from a licensed professional that he was cleared to return to work in any capacity or at any station" and that, even if Shook could have completed his certifications, he did not do so. (Doc. 53 at 4, 6.)[4] This argument misses the point. To be a qualified person under the Rehabilitation Act, the person need only be "*able* to meet all of a program's requirements." *Davis*, 442 U.S. at 406 (emphasis added). "Able to meet" does not mean "has already met." *See Brennan v. Stewart*, 834 F.2d 1248, 1261 (5th Cir. 1988) (stating that the "otherwise qualified" language "cannot refer only to those already capable of meeting *all* the requirements"); *Beauford v. Father Flanagan's Boys' Home*, 831 F.2d 768, 771 (8th Cir. 1987) ("[B]oth the language of the statute and its interpretation by the Supreme Court indicate that [the Rehabilitation Act] was designed to prohibit discrimination within the ambit of an employment relationship in which the employee is *potentially* able to do the job in question." (emphasis added)); *see also Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 24 (1st Cir. 1991) ("[I]n determining whether an individual meets the 'otherwise qualified' requirement of [the Rehabilitation Act], it is necessary to look at more than the individual's *ability* to meet a program's *present* requirements." (first emphasis added)).

Shook informed Chief Smith that he had two of the required releases, (Doc. 50-1 at 44), and was able to complete his certifications if he had been given more time, (*id.* at 39). A reasonable factfinder could find that Summit's letter cleared him for work, albeit with some accommodations, as discussed above. The evidence thus indicates, when construed

---

[4] Shook is correct that the District did not raise in its motion that he is unqualified due to the lapsing of his certifications. (*See generally* Doc. 36.) The District's argument in its reply will nevertheless be addressed because the District responded to an argument raised in Shook's brief. *See Arceo v. Ardent Mills, LLC*, 2023 WL 5096332, at *1 (C.D. Cal. 2023) ("An argument in a reply is not new if it simply responds to arguments asserted in opposition to a motion." (quotation marks omitted)).

in Shook's favor, that he was able to meet Chief Smith's imposed requirements. That Shook had not completed his certifications by November 3 does not mean he was incapable of doing so.

Further, even if Shook's failure to submit his releases and obtain his certifications rendered him unqualified, the District would still not be entitled to summary judgment. Again, if a "handicapped person is not able to perform the essential functions of the job, the court must also consider whether any reasonable accommodation by the employer would enable the handicapped person to perform those functions." *Arline*, 480 U.S. at 287 n.17. Shook's evidence indicates he had two required releases, and the District does not argue that Shook was unable to obtain the required certifications even if they granted him a reasonable accommodation, like the additional time Shook requested in advance of his return-to-work date. (*See* Doc. 50-1 at 44; *see also* Doc. 49 at 11–12.) The District thus has not demonstrated the absence of a dispute of material fact regarding whether Shook was unable to meet Chief Smith's imposed requirements without reasonable accommodation. *See Easley by Easley v. Snider*, 36 F.3d 297, 302 (3d Cir. 1994) ("[I]f there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification or an undue burden, then the handicapped person *is* otherwise qualified . . . .").

Finally, it is not clear from the evidence that Shook's failure to submit his releases or obtain his certifications by the deadline Chief Smith imposed would necessarily render him unqualified. The District's FMLA policy provides that "[f]ailure to provide the [physician's] release may result in a *delay* in the employee's return to work." (Doc. 37-5 at 18 (emphasis added).) The policy thus indicates that an employee who fails to submit necessary documentation to return to work may be delayed in returning to work, not that the employee is immediately deemed no longer qualified and must be terminated. That the policy contemplates a failure to submit documentation resulting in a delayed return also suggests that providing an accommodation of more time for Shook to complete his certifications would not have been unreasonable or unduly burdensome. *See Arline*, 480

- 19 -

U.S. at 287 n.17; *Easley*, 36 F.3d at 302.

To be sure, Shook "bears the ultimate burden of persuasion with regard to whether he is qualified." *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1046 (9th Cir. 1999). But the District's burden for purposes of summary judgment was to "either produce evidence negating [this] element of [Shook's] claim . . . or show that [Shook] does not have enough evidence of an essential element to carry [his] ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. It has not met this burden, and because it does not challenge any other element of Shook's Rehabilitation Act claim, summary judgment will be denied.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 36) is **granted in part**, as follows:

(1) Summary judgment is granted in Defendants' favor on Shook's claims under the FMLA and 42 U.S.C. § 1983;

(2) Summary judgment is granted in Chief Smith's and Captain Love's favor on Shook's claim under the Rehabilitation Act; and

(3) Summary judgment is denied on Shook's claim under the Rehabilitation Act against the District.

**IT IS FURTHER ORDERED** that Defendants Chief Smith and Captain Love are dismissed. The Clerk of Court is directed to terminate Chief Smith and Captain Love as defendants.

**IT IS FURTHER ORDERED** that, consistent with the Court's Case Management Order, (Doc. 19), Shook and the District shall jointly file a "Notice of Readiness for Final Pretrial Conference" within **seven days** of this Order.

Dated this 30th day of September, 2025.

Honorable Sharad H. Desai
United States District Judge